# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 20-1639V

| | |
|---|---|
| CYNDE WALL,<br><br>                        Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                        Respondent. | Chief Special Master Corcoran<br><br>Filed: June 4, 2025 |

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA*, for Petitioner.

*Sarah Black Rifkin, U.S. Department of Justice, Washington, DC*, for Respondent.

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On November 23, 2020, Cynde Wall filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on October 1, 2018. Pet. at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons described below I find that Petitioner is entitled to compensation, and I award **$95,000.00** for past/actual pain and suffering.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I. **Relevant Procedural History**

Following Respondent's informal assessment of the claim (identifying a potential issue related to Table onset), Petitioner submitted a witness declaration and outstanding medical records. *See* ECF Nos. 26, 29. Upon completion of Respondent's review of the claim, the parties attempted to informally resolve this matter but were ultimately unsuccessful. ECF Nos. 32-34, 36, 40-44.

Respondent submitted his Rule 4(c) Report in defense of this case in June 2023. ECF No. 46. In it, he challenged Petitioner's ability to show a Table-consistent onset, noting that Petitioner delayed treatment for three months post-vaccination, and then "vaguely" referenced an onset of pain beginning "'after receiving her flu shot'" or "'since that time.'" *Id.* at 7 (citing Ex. 2 at 46; Ex. 3 at 11).

Petitioner thereafter submitted a motion for a ruling on the record regarding entitlement and damages on March 18, 2024. Mot., ECF No. 49. Petitioner argued that she meets the Table definition of a SIRVA, and requested an award of $107,500.00 for actual pain and suffering. *Id.* at 1. Respondent reacted to Petitioner's entitlement and damages contentions on May 17, 2024. Resp., ECF No. 50. Respondent reiterated his contentions regarding Table onset, and thus argued Petitioner's Table claim must fail. *Id.* at 7-9. Otherwise, if Petitioner was found entitled to damages, Respondent argued that a lesser award of $50,000.00 was appropriate for past pain and suffering. *Id.* at 9. Petitioner filed a reply on June 17, 2024. Reply, ECF No. 51. This matter is now ripe for resolution.

II. **Petitioner's Medical History**

Petitioner's medical history reveals she previously experienced a series of three strokes (beginning in her twenties and lasting into her forties), that "affected her right side" to some degree. *See,* e.g., Ex. 4 at 28; Ex. 2 at 133. Petitioner had gone back to work after these instances, but eventually went on disability and then retired – with the exception of ongoing volunteer work at the time of vaccination. *See id.*

On August 28, 2018 (approximately one month before the subject vaccination), Petitioner visited an urgent care facility complaining of headaches and one week of left-sided neck pain. Ex. 10 at 13. The provider prescribed Flexeril (a muscle relaxer) and told Petitioner to restrict her physical activities. *Id.* at 15.

At age 55, during a visit with her primary care provider ("PCP") for unrelated conditions, Petitioner received the subject flu vaccine on October 1, 2018, in her right

2

deltoid.³ Ex. 1; Ex. 2 at 7, 19. Petitioner did not attest to any immediate post-vaccination pain in her affidavit, or *at all* describe the course of her injury leading up to her first post-vaccination visit for shoulder pain or thereafter. *See generally* Ex. 5.

Approximately three months post-vaccination, on January 3, 2019, Petitioner returned to her PCP "complaining of neck and right arm pain that began in October after receiving her flu shot." Ex. 2 at 46. Petitioner noted her August 2018 urgent care visit for neck pain, and explained that the pain did not improve with medication; she also described "a knot on the bone" of her neck. *Id.* Petitioner stated that she had tried unsuccessfully to treat her neck and right arm pain with ibuprofen and stretching. *Id.*

A physical examination revealed decreased range of motion ("ROM") in the right shoulder due to pain, plus decreased ROM and tenderness of the cervical back. Ex. 2 at 47. The PCP assessed Petitioner with osteoarthritis ("OA") of the spine with radiculopathy of the cervical region, neck pain, and right arm pain. *Id.* at 48. The PCP noted that Petitioner's cervical/neck issues "ha[d] bene [sic] present since August" (which would predate vaccination). *Id.* The PCP also wrote that Petitioner "t[old the PCP that the right arm pain] started before her neck pain, however, [the PCP noted that Petitioner's] timeline does not match her office visits. She had been seen for neck pain as early as August and *arm pain began after influenza vaccination in October*." *Id.* (emphasis added). The treater did not recommend an x-ray of the shoulder⁴ (because it was unlikely to show a fracture without a significant injury) but "suspect[ed] her arm pain is radicular from her neck." *Id.* The PCP recommended physical therapy ("PT"), and prescribed meloxicam (Mobic) and tizanidine (Zanaflex) to treat *both* Petitioner's right shoulder and neck pain. *Id.*

On February 21, 2019, Petitioner followed up with her PCP for right shoulder pain and diarrhea (attributable to her medications). Ex. 2 at 63. Petitioner reported that "her neck pain ha[d] resolved" but she "continue[d] to have right sided shoulder and arm pain." *Id.* at 64. She noted trouble lifting her arm, putting on a shirt over her head, and that her pain is "constant at 2-3/10." *Id.* Petitioner stated she had been taking medication, but that she found "no alleviating factors" for her shoulder pain; rather, the pain increases with movement. *Id.* The PCP noted that Petitioner was "unable to get [PT] [due to] cost." *Id.* Petitioner was referred to an orthopedist for her chronic right shoulder pain and decreased ROM. *Id.* at 66.

---

³ Petitioner also received a pneumococcal polysaccharide vaccine in the left deltoid during this visit. Ex. 1. Petitioner has not alleged an injury as a result of this vaccine, and that particular pneumococcal vaccination is not a vaccine covered under the Vaccine Act.

⁴ A cervical spine x-ray performed the same day showed "moderate degenerative changes" of the cervical spine. Ex. 2 at 48.

Petitioner saw an orthopedist on March 5, 2019. Ex. 3 at 11. Petitioner reported that "back in October of 2018, had a flu shot" and "since that time she had right shoulder pain." *Id.* She rated her pain at a 5/10 at rest but stated she had "significant discomfort" with any type of movement. *Id.* A physical examination showed "smooth glenohumeral motion to 90 degrees of forward flexion and abduction, but . . . significant discomfort in attempting to even passively go above that." *Id.* The orthopedist was unable to test Petitioner's rotator cuff "secondary to discomfort" but noted tenderness over the deltoid/arm. *Id.* An x-ray revealed "no [OA] of the [acromioclavicular ("AC")] joint or the glenohumeral joint." *Id.* at 12. The orthopedist's assessment included a "questionable meniscus tear versus some tendinitis based on the injection site" and Petitioner was referred for an MRI. *Id.*

A March 12, 2019 MRI of the right shoulder produced results consistent with: 1) a deep partial thickness versus full-thickness tear of the far anterior insertional fibers of the supraspinatus tendon; 2) AC joint [OA]; 3) edema in the greater tuberosity; and 4) a probable SLAP tear of the labrum. Ex. 3 at 26.

Petitioner followed up with her orthopedist on April 4, 2019, to go over the results of her MRI. Ex. 3 at 26. Consistent with the MRI findings, the orthopedist assessed Petitioner with "a full-thickness rotator cuff tear . . . significant tendinosis of the intra-articular portion of the biceps tendon . . . AC joint arthrosis as well as impingement." *Id.* The orthopedist recommended a right shoulder arthroscopic surgery with subacromial decompression, distal clavicle excision, rotator cuff repair, and possible biceps tenodesis; Petitioner agreed to proceed with surgery. *Id.*

On April 19, 2019 (now nearly seven months post vaccination), Petitioner underwent arthroscopic surgery. Ex. 3 at 100. The findings revealed a tear of the biceps and a small supraspinatus tear. *Id.* The post-operative diagnosis was listed as rotator cuff tear, subacromial bursitis, AC joint arthrosis, and a biceps tear. *Id.*

Petitioner returned to her orthopedist on May 2, 2019. Ex. 3 at 40. She reported "overall doing pretty well" and rated her pain at a 4/10. *Id.* An examination showed "smooth glenohumeral motion" but strength was not tested at that time. *Id.* The orthopedist prescribed a pain medication (Norco), post-operative PT, and recommended she return in four weeks. *Id.*

The following month, on June 11, 2019, Petitioner underwent an initial PT evaluation. Ex. 3 at 108. The "mechanism of injury" was listed as Petitioner "[r]eport[ed] a flu shot led to problems in her arm" and the date of onset was listed as "October 1st, 2018." *Id.* She rated her pain at a 4/10 (at best), a 10/10 (at worst), and a 6/10 currently;

4

she described the pain as "sharp/stabbing in [right] shoulder." *Id.* Petitioner also noted difficulties putting on clothes, that she "only gets dressed when she absolutely has to," and she could not "properly wash[] herself." *Id.* She told her treater that she was not currently employed but that her "injury keeps her from volunteering . . . playing pool and re-certifying her CPR." *Id.* On examination, Petitioner exhibited guarding of her right shoulder, tightness of the flexor and abductor, and tenderness to touch; her pain (and guarding) prevented an active ROM assessment. *Id.* The physical therapist noted that Petitioner was right-hand dominant, "which limits her ability to perform most [activities of daily living ("ADLs")]." *Id.* at 110. The treater recommended additional PT (twice weekly through at least September 2019) and instructed Petitioner on a home exercise program ("HEP"). *Id.*

On August 7, 2019, Petitioner returned to her PCP for chronic issues including right shoulder pain. Ex. 2 at 82. Petitioner noted that her PT was "going well," as had her surgery. *Id.* The PCP recommended Petitioner continue PT and taking Mobic and Zanaflex. *Id.* at 84.

During an August 21, 2019 orthopedic follow-up visit, Petitioner stated "her shoulder has significantly improved." Ex. 3 at 71. Petitioner rated her pain at a 0/10 and "denie[d] any complaints." *Id.* An examination showed "near full [ROM]" and "good strength." *Id.* at 72. The orthopedist recommended Petitioner continue with PT and transition to an HEP thereafter; she was told to follow-up in two months (in October 2019) or sooner if needed. *Id.*

On January 29, 2020, Petitioner saw another provider in her PCP's office for chronic issues including OA, but without mentioning shoulder pain. Ex. 2 at 112. Petitioner noted she did not want the flu shot and that she was undergoing PT "to repair her rotator cuff tear." *Id.* Petitioner reported that her ROM was "much better." *Id.* The PCP noted that Petitioner's musculoskeletal baseline examination showed limited ROM of all major joints "due to arthritis." *Id.* at 113. Two weeks later, on February 10, 2020, Petitioner returned to her PCP for her routine physical; she did not mention right shoulder complaints. *Id.* at 138-49.

Petitioner's 19th and final PT session occurred on February 13, 2020. Ex. 3 at 186. Petitioner rated her pain at a 0/10 and stated her "shoulder is feeling good and returning to prior level function." *Id.* at 187. The physical therapist noted that Petitioner had "met" her goals of performing her ADLs and housework/yardwork without increased shoulder complaints or limitations, and she could lift a five-pound object from overhead. *Id.* The treater wrote that Petitioner had "made good progress and met all established goals." *Id.* at 188. She was discharged to an HEP. *Id.* at 188-89.

5

On February 20, 2020, Petitioner returned to her orthopedist's office and "denie[d] any issues with her shoulder and rate[d] her pain at a 0/10." Ex. 3 at 86. Petitioner was "pleased with her results." *Id.* The orthopedist wrote that Petitioner had "fully rehabilitated her shoulder." *Id.* The orthopedist also noted that Petitioner "was supposed to follow-up in 6 months postop [in October 2019], but was unable to do so." *Id.* She was discharged from orthopedic care and was told to "discontinue all restrictions and resume activity as tolerated." *Id.* Petitioner did not seek any additional shoulder-related care thereafter.

While Petitioner did not submit an affidavit or declaration describing her post-vaccination injury, course of treatment, or the effect her vaccination has had on her life, Petitioner's sister-in-law submitted a witness declaration. Ex. 9. This individual attested that she saw Petitioner "within one day of the vaccine and hugged her" but "[w]hen [she] did, [Petitioner] exclaimed 'ow!'" *Id.* ¶ 2. According to her sister-in-law, Petitioner then "mentioned that she had severe pain in the right shoulder from her vaccine." *Id.*

Petitioner's sister-in-law explained that "[t]hree or four days later, [Petitioner's] arm and shoulder pain had not improved." Ex. 9 ¶ 4. "Over the next several weeks," Petitioner told her sister-in-law "numerous times" that she had "contacted her doctor via telephone and that the office was dismissive of her complaints." *Id.* To the sister-in-law, this was "strange since [Petitioner] was not even able to lift a gallon of milk with her right arm." *Id.* No additional medical records or affidavit evidence has been filed.

### III.     Fact Findings and Ruling on Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[5] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or

---

[5] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

6

complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records

are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

#### 1. Petitioner Has No Prior Right Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner

8

meets this criterion (Resp. at 7, n.8), and I do not find sufficient evidence in the record to suggest otherwise. To the extent Petitioner suffered from pre-existing symptoms on the right side or in her right shoulder affecting her ability to complete tasks or movements, those facts bear on assessment of a proper damages award.

### 2. Onset of Petitioner's Injury Occurred within 48 Hours of her Vaccination

A petitioner alleging a SIRVA claim must also show that she experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)), and that her pain began within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)). Respondent questions whether Petitioner can establish this criterion. Nonetheless, the medical records preponderantly establish onset of injury close-in-time to vaccination.

Although her first recorded post-vaccination complaint of shoulder pain linked to the subject flu vaccine is from January 3, 2019 (just over three months post-vaccination), Petitioner specifically stated at this time that she had "right arm pain that began in October *after* receiving her flu shot." Ex. 2 at 46 (emphasis added). This entry thus provides support for Table-consistent onset. And this is not a case with intervening medical visits before this date – which could have presented earlier opportunities to complain of vaccine-related pain.[6]

Petitioner's relatively minor treatment delay itself also does not undermine her onset assertions. It is common for SIRVA petitioners to delay seeking treatment, thinking the injury will resolve on its own, especially since patients are often told by medical providers at the time of vaccination to expect some soreness and pain for a period of time after. Individuals also often misconstrue the nature of their injury, and therefore fail to inform treaters of all specific facts relevant to onset until later. And I have found *greater* delays not to have undermined an otherwise-preponderantly-established onset showing. *See,* e.g., *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. for rev. den'd,* 142 Fed. Cl. 329 (2019) (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Williams v. Sec'y of Health & Hum. Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay in seeking treatment for five-

---

[6] I will note that I am not at all relying on Petitioner's sister-in-law's assertion that Petitioner called her PCP several times prior to her first encounter but that such shoulder-related complaints were dismissed. Ex. 9 ¶ 4. Petitioner's medical records do not contain any references to these alleged phone calls, and thus Petitioner's sister-in-law's contention is not independently corroborated.

and-a-half months because a petitioner underestimated the severity of her shoulder injury).

Additionally, Petitioner affirmatively and repeatedly linked the onset of her shoulder pain to the October 2018 vaccination. *See,* e.g., Ex. 3 at 11 (a March 5, 2019 orthopedic note stating that "back in October of 2018, had a flu shot" and "since that time she had right shoulder pain."); Ex. 3 at 108 (a June 11, 2019 PT note "[r]eport[ing] a flu shot led to problems in her arm" and the date of onset was listed as "October 1st, 2018."). Such reporting provides strong support for a close-in-time onset, and without any evidence to the contrary apparent from the filed medical record, this criterion is decided in Petitioner's favor.

Accordingly, and based upon the above, there is preponderant evidence that establishes the onset of Petitioner's right shoulder pain more likely than not occurred within 48 hours of vaccination, and thus within the Table timeframe.

### 3. Petitioner's Pain was Limited to her Right Shoulder

The third requirement for a Table SIRVA is that the pain and limited ROM are limited to the shoulder in which the subject vaccination was administered. 42 C.F.R. § 100.3(c)(10)(iii). Respondent has not contested that Petitioner meets this criterion, and there is not preponderant evidence in the filed record to suggest otherwise.

### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent has likewise not contested this criterion and there is insufficient evidence in the record to suggest it cannot be satisfied.

### B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in her right shoulder on October 1, 2018, in Guthrie, OK. Ex. 1 ¶ 2; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the

United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Ex. 1 ¶ 6; Section 11(c)(1)(E) (lack of prior civil award). As stated above, I have found that the onset of Petitioner's right shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA. Additionally, it is not disputed that Petitioner has established the six-month severity requirement. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement).

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## IV. Damages

The parties have briefed damages in this case, which is limited to a request for a past pain and suffering award. Petitioner requests $107,500.00 for actual pain and suffering. Mot. at 1; Reply at 1. Respondent proposes an award of $50,000.00. Resp. at 9.

### A. Legal Standards for Damages Awards

In several recent decisions, I have discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within the SPU. I fully adopt and hereby incorporate my prior discussion from Sections III and IV of *Leslie v. Sec'y Health & Hum. Servs.*, No. 18-0039V, 2021 WL 837139 (Fed. Cl. Spec. Mstr. Jan. 28, 2021) and *Johnson v. Sec'y of Health & Hum. Servs.,* No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021), as well as Sections II and III of *Tjaden v. Sec'y of Health & Hum. Servs.,* No. 19-419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021). *See also Boyle v. Sec'y of Health & Hum. Servs.,* No. 21-1257V, 2025 WL 1007393 (Fed. Cl. Spec. Mstr. Feb. 26, 2025) (discussing statistical data of compensation awarded in prior SIRVA cases to-date).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr.

Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[7]

### B. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of the injury to be considered. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including all medical records, declarations, plus all filings submitted by both Petitioner and Respondent. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Petitioner supports her pain and suffering demand with reference to two prior damages determinations.[8] *See,* e.g., Mot. at 1. She asserts that she suffered a severe SIRVA, requiring "diagnostic procedures, surgery, and [19] sessions of [PT]," with symptoms and treatment that "spanned a total of [] 11 months."[9] *Id.* at 12; Reply at 2. She requests an award which falls in between the amounts awarded in her comparable cases, acknowledging that her treatment course includes a three-month delay in seeking care (similar, in part, to the petitioner in *Vaccaro*), but noting that she received more PT and experienced a longer duration of pain than the petitioner in *Weed*. Mot. at 12.

Respondent, by contrast, maintains that Petitioner had "an atypical surgical course with a lengthy delay in seeking treatment, a limited range of conservative remedies [i.e., no steroid injections or pre-operative PT], and prompt recovery following surgery" – thus equating to a lower award than typical surgical-SIRVA cases in the Program. Resp. at 11-13. Respondent further relies on Petitioner's decision to delay post-operative PT for one month, to skip a six-month post-operative orthopedic follow up visit, and that she reached

---

[7] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[8] *Weed v. Sec'y of Health & Hum. Servs*., No. 18-1473V, 2021 WL 1711800 (Fed. Cl. Spec. Mstr. Mar. 30, 2021) (awarding $105,000.00 for actual pain and suffering); *Vaccaro v. Sec'y of Health & Hum. Servs.*, No. 19-1883V, 2022 WL 662550 (Fed. Cl. Spec. Mstr. Feb. 2, 2022) (awarding $110,000.00 for actual pain and suffering).

[9] Petitioner's argument regarding the duration of Petitioner's injury appears to contain an error – she contends that her injury course spanned 11 months. Mot. at 12. However, Petitioner also describes a course of formal treatment through February 2020 – which is, in fact, 16 months post vaccination (consistent with Respondent's position). *See id.* at 3; *see also* Resp. at 16.

12

a full recovery by February 2020 (16 months post vaccination) to underscore that Petitioner's course of treatment does not closely resemble that of other surgical-SIRVA cases. *See id.* at 12-16. He thus compares the facts of Petitioner's case to the petitioners in *Merwitz* and *Klausen*.[10] *Id.* at 16-17.

The filed record in this case establishes that Petitioner suffered a moderately-severe SIRVA overall, significant enough to require surgery but mild enough to forego pre-operative conservative treatment options, and to make a full recovery fairly soon after surgery. Particularly probative is the evidence demonstrating Petitioner's delay in seeking treatment for just over three months, subsequent treatment with over-the-counter anti-inflammatories, prescription medications, an x-ray, an MRI (indicative of a deep partial thickness versus full-thickness tear, AC joint OA, edema, and a probable SLAP tear), participation in post-operative PT for a total of 19 sessions (plus an HEP), and one arthroscopic surgery – resulting in *no* lingering effects and pain (Ex. 3 at 86).

Additionally, Petitioner's medical records contain some descriptions of her pain on a ten-point scale, including her reports both before and after surgery. *See,* e.g., Ex. 2 at 64 (a February 21, 2019 PCP note reporting pain at a 2-3/10); Ex. 3 at 11 (a March 5, 2019 orthopedic note reporting pain at a 5/10 at rest but worse with movement); Ex. 3 at 40 (a May 2, 2019 post-surgical orthopedic note reporting pain at a 4/10); Ex. 3 at 108 (a June 11, 2019 PT note reporting pain at a 6/10, with a range from 4-10/10); Ex. 3 at 71 (an August 21, 2019 orthopedic note reporting pain at a 0/10); Ex. 3 at 187 (a February 13, 2020 final PT note reporting pain at a 0/10); Ex. 3 at 86 (a February 20, 2020 orthopedic discharge note rating pain at a 0/10). Such notations support a mild SIRVA upon onset, a worsening of pain while Petitioner healed from surgery, followed by a complete recovery.

Petitioner also complained of and exhibited reduced ROM to some degree throughout her treatment course. *See,* e.g., Ex. 2 at 47 (a January 3, 2019 PCP examination showing decreased ROM due to pain); Ex. 2 at 63-66 (a February 21, 2019 PCP report of trouble putting on a shirt overhead and receipt of a referral to an orthopedist for decreased ROM); Ex. 3 at 11 (a March 5, 2019 orthopedic examination revealing significant discomfort in attempting to even passively go above 90 degrees); Ex. 3 at 71-72 (an August 21, 2019 orthopedic examination showing "near full ROM"); Ex. 2 at 112 (a January 29, 2020 report that her ROM was "much better"). The medical records thus show that Petitioner's limitations in ROM (albeit mild) lasted through (at least) January 2020.

---

[10] *Merwitz v. Sec'y of Health & Hum. Servs.,* No. 20-1141V, 2022 WL 17820768 (Fed. Cl. Spec. Mstr. Nov. 14, 2022) (awarding $50,000.00 for past pain and suffering); *Klausen v. Sec'y of Health & Hum. Servs.,* No. 19-1977V, 2023 WL 2368823 (Fed. Cl. Spec. Mstr. Mar. 6, 2023) (awarding $60,000.00 for past pain and suffering).

Further, the medical record preponderantly establishes (and the parties do not explicitly dispute) that Petitioner's ongoing SIRVA symptoms continued for approximately 16 months (until February 20, 2020), with an active treatment course extending for 13 months, from January 2019 – February 2020. *Compare* Mot. at 1-3, 12 (describing Petitioner's course of treatment through February 2020),[11] *with* Resp. at 12-13 (noting Petitioner's last shoulder-related care occurred in February 2020). While Respondent briefly asserts that Petitioner's orthopedic discharge might have occurred even earlier – as she was instructed to return for a six-month follow up in October 2019 but was "unable to do so" (Resp. at 13, n.10 (citing Ex. 3 at 86)) – this argument is not persuasive when considered against the entirety of the record. Indeed, Petitioner's last PT visit for right shoulder pain occurred on February 13, 2020, with her last orthopedic follow-up one week later. Ex. 3 at 86, 186-87 (reverse order). And it was not until her last PT visit that Petitioner's records show she had "met" all of her PT goals. *See id.* at 187. Thus, it is more likely than not that Petitioner's injury course extended for approximately 16 months (from the date of vaccination in October 2018 through February 2020), resulting in a complete recovery.

Petitioner has relied on one case above her requested amount, and one below, to argue that her personal factual circumstances fall in the middle of her cited comparable cases. *Weed v. Sec'y of Health & Hum. Servs.*, No. 18-1473V, 2021 WL 1711800 (Fed. Cl. Spec. Mstr. Mar. 30, 2021) (awarding $105,000.00 for actual pain and suffering); *Vaccaro v. Sec'y of Health & Hum. Servs.*, No. 19-1883V, 2022 WL 662550 (Fed. Cl. Spec. Mstr. Feb. 2, 2022) (awarding $110,000.00 for actual pain and suffering). These decisions are factually comparable, but not entirely on point. Thus, the overall severity and duration of the injury at issue herein is ultimately slightly distinguishable from Petitioner's two cited comparable decisions.

In *Vaccaro* (the case with the highest award out of Petitioner's cited comparables - $110,000.00), while both claimants delayed treatment for over three months after vaccination – a fact suggestive of a lack of immediate severity - the *Vaccaro* petitioner ultimately reported more severe pain early on in her course of treatment. Thus, that individual reported a higher pain rating on a ten-point scale at her early visits (6-8/10 at initial visits (even after a steroid injection), versus Petitioner's 2-3/10 at her February 2019 visit). *See* 2022 WL 662550; *see also* Ex. 2 at 63-66. And, although the *Vaccaro* petitioner treated for a shorter duration than Petitioner here (eight versus 16 months), *Vaccaro* experienced a more severe treatment course compared to Petitioner, including one steroid injection and considerably more PT (28 sessions over three months versus 19

---

[11] *See supra,* note 9 (stating that Petitioner's argument appears to contain an immaterial error – she contends that the injury course was 11 months but that it lasted through February of 2020, which is, in fact, 16 months post vaccination).

14

sessions over eight months). Petitioner is therefore entitled to a lower award than that awarded to the *Vaccaro* petitioner.

The *Weed* petitioner (who was awarded $105,000.00 for pain and suffering) also experienced a more severe injury. *See* 2021 WL 1711800. That claimant sought treatment within *seven days* of the subject vaccination, and she rated her pain significantly at a 9/10 just one month post vaccination. *See id.* The *Weed* petitioner subsequently underwent surgery just two months after her receipt of the subject vaccine, whereas Petitioner here not only delayed care for over three months but also did not undergo surgery for more than six months post vaccination. I will note, however, that *Weed* was largely recovered by 10 months post-vaccination, and she treated with much less PT than Petitioner in this case (nine versus 19 sessions). Thus, Petitioner is properly entitled to a slightly lower award.

On the other hand, Respondent's cited cases do not provide guidance for a fair award in this case. *Merwitz v. Sec'y of Health & Hum. Servs.,* No. 20-1141V, 2022 WL 17820768 (Fed. Cl. Spec. Mstr. Nov. 14, 2022) (awarding $50,000.00 for past pain and suffering); *Klausen v. Sec'y of Health & Hum. Servs.,* No. 19-1977V, 2023 WL 2368823 (Fed. Cl. Spec. Mstr. Mar. 6, 2023) (awarding $60,000.00 for past pain and suffering). For instance, neither the *Merwitz* nor the *Klausen* petitioner underwent surgery. *See* 2022 WL 17820768; *see also* 2023 WL 2368823. While not a determinative factor of pain and suffering on its own, the fact that Petitioner had an arthroscopic surgery cannot be ignored, and ultimately merits a higher award than that awarded to the petitioners in Respondent's two cited decisions.

Indeed, more often than not I deem a six-figure award appropriate in SIRVA cases where surgery was required (although there is no hard and fast rule to this effect). *See Gray v. Sec'y of Health & Hum. Servs.,* No. 20-1708V, 2022 WL 6957013, at *5 (Fed. Cl. Spec. Mstr. Sept. 12, 2022) (stating that "an award of at least $100,000.00 is not automatically appropriate for all SIRVA injuries simply because arthroscopic surgery was involved."). I have awarded less in several cases featuring surgery, where the specific circumstances of the claim merit a lower award. *See,* e.g., *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for past pain and suffering); *see also Shelton v. Sec'y of Health & Hum. Servs.,* No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) (awarding $97,500.00 for pain and suffering wherein the petitioner underwent surgery but delayed seeking treatment for five months post vaccination, followed by an additional three-month delay before seeking further treatment). Still, I consider $50,000.00 too low given the totality of facts relating to Petitioner's injury.

Overall, this case falls best within the *Hunt* and *Shelton* line of cases, with the more-recent case of *Shields* – involving a $95,000.00 pain and suffering award – perhaps being the most useful comparable. *See Hunt*, 2022 WL 2826662;[12] *Shelton,* 2021 WL 2550093; *see also Shields v. Sec'y of Health & Hum. Servs.,* No. 20-1970V, 2024 WL 5261893 (Fed. Cl. Spec. Mstr. Nov. 26, 2024). The *Shields* petitioner delayed seeking treatment for nearly four months post-vaccination, rated his pain ranging from a 5-10/10, had significant findings on MRI (including a bursal tear, plus AC joint arthrosis), he received two steroid injections, and underwent 18 total sessions of PT (both pre- and post-operatively), plus one arthroscopic surgery. *See* 2024 WL 5261893, at *9. *Shields* treated for a total of 15 months but only required one month of post-surgical care (having underwent surgery 14 months into his course of treatment). *Id.* I determined that in light of the *Shields* petitioner's delay in seeking care, five-month gap in treatment, and failure to provide sufficient evidence of unique personal limitations caused by his vaccine-related injury, he had not justified a six-figure award. *Id.* at *10-11.

The same is largely true here. Both Petitioner and the petitioner in *Shields* delayed seeking care for a considerable amount of time (over three months), exhibited significant pathology (along with degenerative) findings on MRI, underwent a fairly equal number of PT sessions (18 versus 19 sessions), had one arthroscopic surgery, and treated for a similar duration (15 versus 16 months). And both claimants experienced a worsening of pain while healing from surgery, followed by a fairly swift recovery thereafter. *See Shields,* 2024 WL 5261893, at *9 (reporting pain rated at a 6-10/10 post surgery); *see also* Ex. 3 at 108 (rating pain at a 4-10/10 post surgery). However, the *Shields* petitioner had one gap in care, whereas Petitioner here maintained continuous treatment for her right shoulder pain throughout her entire course. Despite his treatment gap, the *Shields* petitioner nonetheless had a slightly more severe treatment course, including two steroid injections (when Petitioner comparatively had none). Therefore, an equivalent sum is properly awarded.

I also observe that Petitioner here did not provide *any* evidence of unique personal circumstances or limitations that her vaccine-related injury has had on her life; nor did she describe the course of her injury with any particularity. *See generally* Ex. 5. Without such evidence, I am unable to glean the impact her vaccine injury has had on her day-to-day life, outside of the entries contained in the contemporaneous medical records. While one of Petitioner's PT records contains a note regarding Petitioner's inability to volunteer, perform CPR or play pool (Ex. 3 at 108), this is not analogous to the plethora of affidavit evidence typically supplied in support of an appropriate damages determination in the

---

[12] Although at SPU "Motions Day" proceedings I often chastise Respondent for over-reliance on *Hunt,* this matter presents exactly the kind of circumstances where it stands as a reasonable comparable for guidance.

Program. Still, in light of this notation, I will afford these minimal noted limitations some – albeit *extremely* slight – weight.[13]

## CONCLUSION

**In view of the evidence of record, I find that there is preponderant evidence that the onset of Petitioner's injury, specifically shoulder pain, was within 48 hours of her vaccine and she has otherwise satisfied the requirements for a Table SIRVA claim. Further, based on the evidence of record, I find that Petitioner is entitled to compensation.**

I also find that, for all of the reasons discussed above and based on consideration of the record as a whole, **$95,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**

**Accordingly, Petitioner is awarded a lump sum of $95,000.00 (for actual pain and suffering) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.**[14] This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[15]

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[13] I will also note that while Respondent alluded to Petitioner's pre-existing medical history (including limitations on the right side due to a series of strokes) as being relevant to a proper damages determination (Resp. at 7, n.8), there is no evidence in the filed record to support that Petitioner was in any way limited in her activities affecting the right shoulder as a result of these strokes. I thus am unable to rely on this in determining an appropriate award of pain and suffering. I likewise do not find Petitioner's pre-existing neck injury (in August 2018) to bear on an appropriate damages award herein, as Petitioner ultimately received separate (but concurrent) treatment for her right shoulder.

[14] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[15] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.